# IN THE SUPREME COURT OF IOWA

No. 81 / 05–1853

Filed May 30, 2008

**MAGELLAN HEALTH SERVICES, INC.**

    Appellee,

vs.

**HIGHMARK LIFE INSURANCE COMPANY,**

    Appellant,

**WELLMARK, INC., d/b/a
WELLMARK BLUE CROSS AND
BLUE SHIELD OF IOWA** and
**WELLMARK HEALTH PLAN OF
IOWA, INC.,**

    Appellee.

---

Appeal from the Iowa District Court for Polk County, Douglas F. Staskal, Judge.

Defendant appeals district court grant of summary judgment to the plaintiff, which determined that defendant was the primary insurer and thus liable for coverage. **AFFIRMED.**

Denny M. Dennis of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, and Stephen F. Ban of Metz Lewis LLC, Pittsburgh, Pennsylvania, for appellant.

Michael A. Dee of Brown, Winick, Graves, Gross, Baskerville and Shoenebaum, P.L.C., Des Moines, and Erica J. Dominitz of Dickstein, Shapiro, Morin & Oshinsky LLP, Washington, D.C., for appellee Magellan.

Hayward L. Draper and Thomas H. Walton, Nyemaster, Goode, West, Hansell & O'Brien, P.C., Des Moines, for appellee Wellmark.

**APPEL, Justice.**

In this case, we are called upon to determine the legal ramifications of conflicting coordination of benefits provisions in a self-funded welfare benefit plan governed by the Employee Retirement Income Security Act of 1975 (ERISA) and an individual health insurance policy issued pursuant to Iowa Code chapter 513C.

## I. Factual Background and Prior Proceedings.

John Doe was diagnosed with leukemia in the 1990s. His medical bills were initially paid through group health insurance coverage provided by his mother Jane Doe's employer, Principal Financial Group. At the same time, John was also covered as a dependent under his father's group insurance plan—the Magellan "90/60 Preferred Provider Option" (Magellan 90/60 Policy). The Magellan 90/60 Policy was administered by CareFirst of Maryland, Inc. d/b/a CareFirst BlueCross BlueShield (CareFirst). The Magellan 90/60 Policy was issued under a self-funded plan governed by ERISA.

In 1997, Jane left Principal for other employment. She exercised her COBRA rights, and John's medical bills continued to be paid by Principal for eighteen months. After COBRA benefits were exhausted, John continued to be covered as a dependent under his father's insurance plan.

Although John was covered by the Magellan 90/60 Policy, Jane was concerned that group plan administrators might deny her son specialized treatment because such care was not "medically necessary." In order to guarantee that benefits would be available for desired care, Jane obtained an individual insurance policy for John from Wellmark (Wellmark Policy). The Wellmark Policy was issued pursuant to Iowa Code chapter 513C, which requires health insurers operating in Iowa to provide a basic or standard level of health insurance coverage to an Iowa resident regardless

of the person's health status. The Wellmark Policy became effective on May 1, 1999.

In July 1999, the Iowa Insurance Commissioner promulgated regulations mandating that policies issued pursuant to Iowa Code section 513C.9 "shall not duplicate benefits paid under any other health insurance coverage." Iowa Admin. Code r. 191—75.7(4). As a result of this mandatory regulation, John's Wellmark Policy was amended to state that "[b]enefits covered . . . will not duplicate benefits covered under any other health insurance coverage." Such a limitation is commonly referred to as "always secondary" language.

The Magellan 90/60 Policy also had a provision related to coordination of benefits, often referred to by the acronym COB. The relevant COB language in the Magellan 90/60 Policy is as follows:

> ***This plan*** determines its order of benefits using the first of the following rules that applies:
>
> 1) Non-dependent/dependent. The benefits of the ***plan*** which covers the person as an employee, member or ***subscriber*** (that is, other than as a dependent) are determined before those of the ***plan*** which covers the person as a dependent . . . .
>
> . . . .
>
> 7) Longer/shorter length of coverage. If none of the above rules determines the order of benefits, the benefits of the ***plan*** that covered an employee, member or ***subscriber*** longer are determined before those of the ***plan*** that covered that person for the shorter term.

(Emphasis in original).

After Jane obtained the individual "always secondary" Wellmark Policy, CareFirst, acting on behalf of Magellan, discovered the dual coverage for John. Wellmark informed CareFirst that it believed the Wellmark Policy provided coverage that was secondary to the coverage in the Magellan

90/60 Policy. CareFirst reviewed the issue and came to the same conclusion.

Unfortunately, in late 2001, John's leukemia returned. Substantial medical expenses incurred on behalf of John in 2001 and 2002 were paid by CareFirst pursuant to its determination that the Magellan 90/60 Policy was the primary insurer.

In late 2001, Magellan purchased a stop-loss reinsurance policy with Highmark to cover health care claims made under the Magellan 90/60 Policy during calendar year 2002. In November 2002, Magellan submitted a claim with Highmark to recover the catastrophic costs that it incurred on John's behalf. In February 2003, Highmark denied the claim, having determined that the Magellan 90/60 Policy was secondary to the primary coverage of the Wellmark Policy. As a result, according to Highmark, coverage under the Wellmark Policy had to be exhausted before the Magellan 90/60 Policy became liable for John's medical expenses.

On October 3, 2003, Magellan filed suit against Highmark and Wellmark. Among other claims, Magellan alleged that Highmark had breached the provisions of its stop-loss policy by failing to reimburse Magellan for John's medical expenses in 2002. Highmark countered that ERISA preempted application of the "always secondary" regulation and that the COB language of the Magellan 90/60 Policy rendered the Wellmark Policy primarily liable for the claims submitted by John. All parties filed for summary judgment.

On October 10, 2005, the district court granted Magellan's motion for summary judgment and denied Highmark's motion. The court's resolution mooted Wellmark's motion. The district court held that ERISA did not preempt Iowa Code chapter 513C and the accompanying "always secondary" regulation. According to the district court, the provisions of

Iowa Code chapter 513C and the accompanying regulation lacked the required "reference to" or "connection with" an ERISA plan to trigger preemption because the statute did not "touch on the main purposes underlying ERISA." As a result, the mandatory provisions of Iowa Code chapter 513C and the accompanying regulation supported Magellan and Wellmark's claim that the Wellmark Policy coverage was secondary to that provided by the Magellan 90/60 Policy. Although the district court did not so state, the logical impact of the district court's determination was that Magellan was legally required under the mandate of Iowa Code chapter 513C and the accompanying "always secondary" regulation to pay the claim of its insured, and that Highmark was in turn required to reimburse Magellan pursuant to the stop-loss policy Highmark issued to Magellan.

Based on the above rationale, the district court entered judgment in favor of Magellan and Wellmark against Highmark. After the ruling, the parties stipulated that the amount of damages involved in the case was $919,596.

On appeal, Highmark seeks to overturn the district court's judgment by advancing two propositions. First, Highmark argues that ERISA preempts Iowa Code chapter 513C, thereby preventing Magellan and Wellmark from relying upon the command in Iowa Administrative Code rule 191—75.7(4) that the Wellmark Policy is an "always secondary" policy. Second, assuming Iowa Code chapter 513C as implemented by Iowa Administrative Code rule 191—75.7(4) is preempted, Highmark asserts that, as a matter of federal common law, the Magellan 90/60 Policy coverage is secondary under the contractual terms of both policies.

Magellan and Wellmark counter that regardless of the preemption analysis, the Magellan 90/60 Policy is primary under federal common law. In any event, Magellan and Wellmark contend that chapter 513C and the

accompanying "always secondary" regulation are not preempted by ERISA. Further, Magellan and Wellmark contend that regardless of the preemption and federal common law analysis, the decision of Magellan and its administrator, CareFirst, should be upheld as reasonable and made in good faith. Finally, Wellmark advances the argument that when the relevant language is properly interpreted, there is no conflict between the Magellan 90/60 Policy and the Wellmark Policy.

## II. Standard of Review.

Summary judgment is reviewed for correction of errors at law. *Buechel v. Five Star Quality Care, Inc.*, 745 N.W.2d 732, 735 (Iowa 2008). Summary judgment should be upheld where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* In reviewing the record, the evidence is considered in the light most favorable to the nonmoving party. *Id.*

## III. Discussion.

**A. Introduction.** This case requires the court to determine how the benefits of a self-funded ERISA group health policy and a non-ERISA individual health insurance policy should be coordinated with respect to a claim admittedly covered by both policies. There is no question that the insured is entitled to benefits and, in fact, the benefits have been paid. The fighting issue presented in this case is which insurer must bear the loss.

The threshold question is whether the "always secondary" mandate of Iowa Code chapter 513C as implemented by Iowa Administrative Code rule 191—75.7(4) is preempted by ERISA.[1] If not preempted, the "always secondary" provision is fully applicable, Magellan is liable for the loss, and Highmark, as the stop-loss insurer, must pay Magellan. If, on the other

---

[1]Highmark does not challenge the validity of the administrative rule or Magellan's interpretation that it amounts to an "always secondary" mandate for chapter 513C policies.

hand, the "always secondary" provision is subject to ERISA preemption, the statutory command has no force and effect and does not resolve the case.

If the "always secondary" provision of Iowa Code chapter 513C as implemented by Iowa Administrative Code rule 191—75.7(4) is preempted, however, a second set of questions must be addressed, namely, whether the COB provisions of the Magellan 90/60 Policy and the Wellmark Policy conflict and, if they do, how the conflict should be resolved. We do not reach this second set of questions, however, as we find that the "always secondary" regulation is not preempted by ERISA.

## B. ERISA Preemption of Iowa Code Chapter 513C.

1. *Framework for ERISA preemption analysis.* ERISA provides three clauses that relate to the relationship between ERISA and state law: the preemption clause, the savings clause, and the deemer clause. Under ERISA, any provision of state law which "relates to" an ERISA plan is superseded under what is known as the preemption clause of ERISA. 29 U.S.C. § 1144(a). On the other hand, state insurance, banking, or securities laws are explicitly removed from preemption under ERISA's savings clause. *Id.* § 1144(b)(2)(A). What is known as the ERISA deemer clause, however, further provides that an employee benefit plan may not be "deemed to be an insurance company . . . or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, [or] insurance contracts. . . ." *Id.* § 1144(b)(2)(B).

Analysis of ERISA preemption ordinarily requires three steps. The first step is whether the state statute in question "relates to" an ERISA plan and is therefore within the scope of the preemption clause. If so, the next question is whether the state statute is nonetheless saved through application of the savings clause. Finally, where a state statute falls within

the scope of the preemption clause but is also within the scope of the savings clause, the analysis moves on to a determination of whether the savings clause does not apply as a result of the deemer clause.

2. *Highmark arguments in favor of ERISA preemption of Iowa Code chapter 513C.* Highmark asserts that Iowa Administrative Code rule 191—75.7(4) is unenforceable because it is preempted by ERISA. According to Highmark, the "always secondary" provision "relates to" or is "connected with" the ERISA plan in this case. In support of its position, Highmark cites *FMC Corp. v. Holliday*, 498 U.S. 52, 111 S. Ct. 403, 112 L. Ed. 2d 356 (1990). In *FMC*, the United States Supreme Court held that a Pennsylvania anti-subrogation statute which prohibited self-funded ERISA plans from requiring reimbursement in the event of recovery from a third party was preempted by ERISA. *Id.* at 65, 111 S. Ct. at 411, 112 L. Ed. 2d at 369. According to the Supreme Court in *FMC*, the anti-subrogation statute was an insurance statute under the ERISA savings clause, but could not be applied against a self-funded ERISA plan by virtue of the deemer clause. *Id.* Highmark asserts that like the Pennsylvania statute in *FMC*, Iowa Code chapter 513C impermissibly overrides benefit provisions in self-funded ERISA plans.

Highmark claims that the approach in *FMC* has been followed in at least three federal circuits. For example, in *LaRocca v. Borden, Inc.*, 276 F.3d 22, 30 (lst Cir. 2002), the First Circuit Court of Appeals held that "ERISA preempts state legislation designed to limit plans' . . . coordination of benefit provisions." Similarly, in *Auto Owners Insurance Co. v. Thorn Apple Valley, Inc.*, 31 F.3d 371, 375 (6th Cir. 1994), the Sixth Circuit Court of Appeals held that COB provisions of self-insured ERISA plans trump state laws which seek to make no-fault policies always secondary payers. Further, the Eighth Circuit Court of Appeals in *Prudential Insurance Co. of*

*America v. National Park Medical Center, Inc.*, 413 F.3d 897, 912–13 (8th Cir. 2005), utilizing *FMC* concepts, held that an Arkansas "any willing provider" law was preempted by the deemer clause as applied to self-funded plans.

Highmark recognizes that in several cases subsequent to *FMC*, the United States Supreme Court "sharpened" its review of ERISA preemption. *See De Buono v. NYSA-ILA Med. & Clinical Serv. Fund*, 520 U.S. 806, 117 S. Ct. 1747, 138 L. Ed. 2d 21 (1997) (finding gross receipts tax not preempted); *Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 117 S. Ct. 832, 136 L. Ed. 2d 791 (1997) (finding wage payment statute not preempted); *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 115 S. Ct. 1671, 131 L. Ed. 2d 695 (1995) (finding surcharges on hospital rates not preempted). According to Highmark, however, these cases did not represent a sea change from the approach in *FMC*, but only a refinement of ERISA preemption analysis. Further, Highmark emphasizes that unlike, for instance, the wage payment statute involved in *Dillingham*, the payment of plan benefits is a core area of ERISA concern.

Highmark asserts that its position is supported by the relatively recent case of *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 121 S. Ct. 1322, 149 L. Ed. 2d 264 (2001). In that case, the United States Supreme Court held that a state statute providing for automatic revocation of beneficiary designations upon divorce was preempted as applied to ERISA plans. *Id.* at 152, 121 S. Ct. at 1330, 149 L. Ed. 2d at 274–75. The Court noted that the state statute that bound plan administrators to a particular choice of rules in determining beneficiary status involved an area of core ERISA concern including ERISA's provision that a plan shall " 'specify the basis on which payments are made to and from the plan.' " *Id.* at 147, 121 S. Ct. at 1327, 149 L. Ed. 2d at 271 (quoting 29 U.S.C. § 1102(b)(4)). The

Supreme Court further stated that the payment of benefits was "a central matter of plan administration." *Id.* at 148, 121 S. Ct. at 1328, 149 L. Ed. 2d at 272. Finally, the Supreme Court in *Egelhoff* stressed the need for nationally uniform plan administration in such core matters. *Id.* According to Highmark, the Supreme Court's emphasis in *Egelhoff* on the core nature of payment of benefit provisions and the need for national uniformity apply with equal force in this case.

Additionally, Highmark notes that the Eighth Circuit has adopted a multi-factored test to determine whether a state law has sufficient "connection with" ERISA plans to trigger preemption. *See Ark. Blue Cross & Blue Shield v. St. Mary's Hosp., Inc.,* 947 F.2d 1341, 1344–45 (8th Cir. 1991). According to Highmark, the "always secondary" regulation meets most of the criteria of the multi-factored test by negating a provision of the Magellan 90/60 Policy, affecting the relationships between primary ERISA entities and the structure of ERISA plans, adversely impacting the uniform administration of ERISA plans, causing an economic impact on an ERISA plan, and being inconsistent with the deemer clause, which provides that self-funded ERISA plans are not subject to the state regulation.

3. *Magellan and Wellmark arguments against ERISA preemption of Iowa Code chapter 513C.* Magellan and Wellmark provide a markedly different analysis of ERISA preemption. They assert that the "always secondary" regulation does not fall within the scope of the preemption clause and that as a result, the statute is fully applicable and Magellan is entitled to reimbursement.

While Magellan and Wellmark recognize the broad preemption analysis in *FMC*, they claim the Supreme Court significantly narrowed the scope of preemption in *De Buono*, 520 U.S. at 806, 117 S. Ct. at 1747, 138 L. Ed. 2d at 21, *Dillingham*, 519 U.S. at 316, 117 S. Ct. at 832, 136 L. Ed.

2d at 791, and *Travelers Insurance*, 514 U.S. at 645, 115 S. Ct. at 1671, 131 L. Ed. 2d at 695. Specifically, Magellan and Wellmark note that in *Travelers Insurance*, the United States Supreme Court stated that Congress addressed the claims of preemption "with the starting presumption that Congress does not intend to supplant state law." *Travelers Ins.*, 514 U.S. at 654, 115 S. Ct. at 1676, 131 L. Ed. 2d at 704. Further, Magellan and Wellmark cite *Dillingham* for the proposition that a state law has "reference to" ERISA only "[w]here a State's law acts immediately and exclusively upon ERISA plans . . . or where the existence of ERISA plans is essential to a law's operation. . . ." *Dillingham*, 519 U.S. at 325, 117 S. Ct. at 838, 136 L. Ed. 2d. at 799.

Magellan and Wellmark further assert that under *Dillingham*, the "connection with" test of ERISA preemption requires the court to look at both " 'the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive' . . . as well as the nature of the effect of the state law on ERISA Plans." *Id.* (quoting *Travelers Ins.*, 514 U.S. at 656, 115 S. Ct. at 1677, 131 L. Ed. 2d at 705). Under these authorities, Magellan and Wellmark argue, the district court correctly held that Iowa's "always secondary" regulation has no "relation to" ERISA plans because it does not operate directly and exclusively on them. Nor is it "connected with" ERISA plans, according to Magellan and Wellmark, because the statute does not clearly touch on the objectives of ERISA. Congress thus must have understood that it is the type of law that would survive ERISA preemption.

Magellan and Wellmark also argue that Highmark's reliance upon *Egelhoff* is misplaced. In *Egelhoff*, the Supreme Court held that a state statute which automatically revoked beneficiary designations where the beneficiary is a divorced spouse, had a "connection with" a core area of

ERISA concern, namely, rules for determining the status of beneficiaries. *Egelhoff*, 532 U.S. at 147, 121 S. Ct. at 1327, 149 L. Ed. 2d at 271–72. According to Magellan and Wellmark, *Egelhoff* is distinguishable from the present case because the state statute interfered with the relationship between an ERISA plan and a plan beneficiary and with national uniform administration of ERISA. Further, according to Magellan and Wellmark, the "always secondary" regulation in this case, unlike the beneficiary-terminating provision in *Egelhoff*, is a health measure designed to mandate the availability of a standard or basic insurance policy for residents who do not otherwise qualify for health care. Magellan and Wellmark assert that such a generally applicable health care measure is not the kind of legislation that Congress intended to preempt.

Magellan and Wellmark further challenge Highmark's claim that the "always secondary" regulation is preempted under the multi-factored ERISA preemption test utilized by the Eighth Circuit in *Arkansas Blue Cross & Blue Shield*, 947 F.2d at 1341. According to Magellan and Wellmark, Iowa Code chapter 513C and Iowa Administrative Code rule 191—75.7(4) do not conflict with the terms of the Magellan 90/60 Policy, but instead simply determine which of the available COB provisions in the Magellan 90/60 Policy applies. Magellan and Wellmark further contend that Iowa Code chapter 513C and the "always secondary" regulation do not affect the relations between primary ERISA entities or the structure of the Magellan 90/60 Policy, do not have an economic impact other than a remote or peripheral one, are not inconsistent with other provisions of ERISA, and simply involve a health care regulatory issue that is historically a matter of local concern.

4. *Analysis of Preemption Issue.* At the outset, it is clear that Iowa Code chapter 513C and the accompanying "always secondary" regulation do

not make "reference to" ERISA plans and are not targeted directly and exclusively toward ERISA plans. As a result, the only question regarding the application of the preemption clause in ERISA is whether the "always secondary" regulation is sufficiently "connected with" ERISA to trigger preemption.

The standard for determining whether a state law is "connected with" ERISA plans in a fashion sufficient to cause preemption is subject to considerable controversy. In *Dillingham*, the Supreme Court stated that courts should look to "the objectives" of ERISA as well as the "nature of the effect of the state law" on ERISA plans in determining whether state law is preempted. *Dillingham*, 519 U.S. at 325, 117 S. Ct. at 838, 136 L. Ed. 2d at 800. This formulation hardly provides clear guidance. In *Travelers Insurance*, however, the Supreme Court stated that reviewing courts should begin the preemption analysis "with the starting presumption that Congress does not intend to supplant state law." *Travelers Ins.*, 514 U.S. at 654, 115 S. Ct. at 1676, 131 L. Ed. 2d at 704.

In this case, the main objective of ERISA, namely, providing employees with stable benefits, is not seriously eroded by the application of the "always secondary" language of Iowa Administrative Code rule 191—75.7(4). John's mother determined that in order to avoid the possibility of an unreasonable benefits determination by an ERISA plan, she would purchase an individual non-ERISA insurance plan as a back-up policy. When there is multiple coverage of a given loss, COB analysis is commonplace in the insurance industry. Unlike *Egelhoff*, Iowa Code chapter 513C and the "always secondary" regulation do not affect rules for determining the status of beneficiaries.

Further, the objective of Iowa Code chapter 513C and the "always secondary" regulation is "to promote the availability of health insurance

coverage to individuals regardless of their health status or claims experience. . . ." Iowa Code § 513C.2. The policy underlying Iowa Code chapter 513C and Iowa Administrative Code rule 191—75.7(4), thus does not undercut ERISA objectives. Further, promoting the availability of health insurance coverage to persons who might not otherwise obtain it is within the scope of police powers traditionally left to state regulation. *De Buono*, 520 U.S. at 814, 117 S. Ct. at 1752–53, 138 L. Ed. 2d at 29. Under this record, we conclude there is no reason to believe that chapter 513C and Iowa Administrative Code rule 191—75.7(4) so clearly touch on the objectives of ERISA that Congress must have understood that this is the type of law that would not survive ERISA.

As a result, we hold that the "always secondary" provision in Iowa Code chapter 513C as implemented by Iowa Administrative Code rule 191—75.7(4) is not preempted by ERISA.[2] Because of the mandate of the "always secondary" rule, the Magellan 90/60 Policy provides primary coverage in this case. Therefore, the district court properly granted summary judgment to Magellan and denied summary judgment to Highmark.

**IV. Conclusion.**

The district court order granting Magellan summary judgment and denying summary judgment to Highmark is affirmed.

**AFFIRMED.**

All justices concur except Ternus, C.J., and Baker, J., who take no part.

---

[2]Because we find the "always secondary" provision in Iowa Code chapter 513C, as implemented by the Iowa Administrative Code rule 191—75.7(4), is not within the scope of ERISA's preemption clause, 29 U.S.C. § 1144(a), the savings and deemer clauses, 29 U.S.C. §§ 1144(b)(2)(A), (B), have no application.